Angelo **CANTONE**, Plaintiff-Appellee,

v.

**SUPERINTENDENT, NEW YORK CORRECTIONAL FACILITY AT GREEN HAVEN, and Robert Abrams, Attorney General of the State of New York, Defendants-Appellants.**

**No. 414, Docket 84–2227.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 15, 1984.

Decided March 26, 1985.

Reversed and remanded for dismissal of petition.

Lawrence J. Schwarz, Asst. Dist. Atty., Mineola, N.Y. (Denis Dillon, Dist. Atty., Nassau County, Bruce E. Whitney, Asst. Dist. Atty., Mineola, N.Y., of counsel), for defendants-appellants.

Martin Geduldig, Garden City, N.Y., Alfred Mancuso, Leonard Michaels, paralegals, for plaintiff-appellee.

Before OAKES and VAN GRAAFEILAND, Circuit Judges, and TENNEY, Senior District Judge.*

TENNEY, Senior District Judge.

Respondents ("the State") take this appeal from a judgment of the United States District Court for the Southern District of New York, Whitman Knapp, Judge, granting a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (1982). Petitioner Angelo Cantone ("Cantone") claimed below that the State's failure to disclose certain information constituted a violation of due process under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Fur-

---

* United States Senior District Judge of the South- ern District of New York, sitting by designation.

ther, Cantone claimed that the failure to grant his motion for a mistrial also constituted a due process violation. Finding that there had, indeed, been a *Brady* violation in the state trial court, the district court granted the habeas petition. The district court did not reach the merits of Cantone's mistrial claim.[1]

We agree with the district court that the State improperly withheld information specifically requested by the petitioner. We are, however, constrained to reverse on the ground that the information withheld does not meet the applicable standard of materiality. We find that there is not "any reasonable likelihood," *Ostrer v. United States*, 577 F.2d 782, 786 (2d Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979), that the disclosure of this information "could have affected the outcome of the trial." *Id.* Therefore, we find that the nondisclosure did not deprive petitioner of due process of law, and that a writ of habeas corpus should not have issued on this ground.

The district court found that the petitioner's mistrial claim was properly before it. We disagree, and find that the petitioner forfeited this claim through procedural default in the state courts and that he did not show, under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), that he was entitled to relief from this forfeiture effect. Therefore, he is precluded from raising this claim in this federal habeas action.

### BACKGROUND

Petitioner Cantone and two co-defendants, Alfred Gourdet ("Gourdet") and Michael Quaranta ("Quaranta"), were indicted for the sale and possession of cocaine. The purchaser was Special Agent Carliese Gordon ("Agent Gordon") who was then an undercover agent assigned to the Long Is-

land office of the federal Drug Enforcement Administration. The sale commenced at Gourdet's home after Agent Gordon and the three defendants had gathered there. The defendants were subsequently arrested at a bank where they expected to receive payment for the cocaine.

After the trial began, defendant Gourdet was granted a severance and a mistrial. Gourdet subsequently entered into a plea, and testified as a witness for the prosecution. Cantone and Quaranta also moved for a mistrial, without success, and both were found guilty.[2]

The testimony of the parties, including that of Cantone, revealed few factual disputes regarding the sale and arrest. The central issue was the state of mind of the defendants. Petitioner's theory of defense was that he was an innocent bystander to the sale, that he was at Gourdet's residence at the time in question in order to collect a debt owed to him by Gourdet, and that the sale was arranged exclusively between Gourdet and Agent Gordon. The State sought to prove, to the contrary, that Cantone had been fully aware of the purpose of the meeting and was instrumental in bringing the sale to fruition.

### Agent Gordon's Testimony

Agent Gordon, a principal witness for the prosecution, gave the following testimony. He stated that on August 22, 1977, he contacted Gourdet, whom he had met through a confidential informant, and told him that he was interested in purchasing two kilos of cocaine. Gourdet told him that he could supply this quantity. On August 23rd, Agent Gordon took Gourdet to a bank to view the money to be used in the sale, and they arranged to meet at Gourdet's house later that night to carry out the sale. Gourdet, however, subsequently cancelled the meeting because a third party—Gour-

---

1. 589 F.Supp. 440 (S.D.N.Y.1984).

2. Petitioner and Quaranta were both convicted of criminal sale of a controlled substance in the first degree, N.Y.Penal Law § 220.43 (McKinney 1980), criminal possession of a controlled substance in the first degree, *id.* § 220.21, and crim-

inal possession of a controlled substance in the third degree. *Id.* § 220.16. In December 1978, petitioner was sentenced to fifteen years to life for both the sale and the first degree possession, and eight-and-one-third years to life for third degree possession.

det's "man in Brooklyn"—was unable to meet with them as planned. The next day, Gourdet called Agent Gordon and said that his man from Brooklyn had arrived at the house, and that he had the cocaine Agent Gordon wanted.

Once at Gourdet's house, Agent Gordon was escorted to the basement where he found Cantone and Quaranta. Agent Gordon testified that Cantone was carrying a brown leather bag from which he removed a plastic bag containing a white brick. Gourdet placed a scale on the table, and Cantone and Agent Gordon weighed the cocaine. Cantone then placed the cocaine back in the brown leather bag.

Agent Gordon also testified that Cantone said he had not brought the entire amount of cocaine ordered. Cantone offered, however, to bring the rest of the order to Agent Gordon that night. Cantone also stated that once Agent Gordon was "in with the family" he would have no problem —"the family" would take care of him.[3]

### Gourdet's Testimony

At the outset, Gourdet reported fully on his plea and the cooperative agreement he had entered into. After he was granted a severance and a mistrial, Gourdet entered into an agreement to plead guilty with the understanding that he was to testify truthfully at trial. Gourdet was advised that further cooperation by him might lead to a reduction in his jail sentence.[4]

Gourdet testified that in August 1977 Cantone owed him $6,000. Cantone told Gourdet that, if he wanted to be repaid, he could sell cocaine which Cantone would give him, and he could apply the profits from the sales toward satisfaction of the debt.[5] Gourdet's testimony regarding the transaction in question basically corroborated Agent Gordon's testimony.

Gourdet also testified that, after the defendants were arrested, Cantone told Gourdet to "keep [his] mouth shut," and to say that Cantone had been on the premises just to collect a debt of $3,000 that Gourdet owed him. On another occasion, Cantone indicated that Gourdet should fear for his life if he testified against him. Gourdet also testified that, after the trial started, Cantone told Gourdet he should leave the country, and write a letter from abroad stating that Cantone and Quaranta had nothing to do with the transaction.

On cross-examination, Gourdet testified that he had been involved in prior cocaine deals, and that he had contacts with certain people in foreign countries who acted as "security" for drug export schemes by assuring that people involved in drug transport could enter and leave those countries without complications. He also testified that at the time of trial he was under two indictments for the sale of drugs.[6]

### Cantone's Testimony

Petitioner subsequently took the stand and testified that he had gone to Gourdet's house on the date in issue in order to collect $3,000 Gourdet owed him. Petitioner testified that he did not know what kind of business deal had been arranged by Gourdet, and that when he arrived in the basement of Gourdet's home, there was a paper bag on the table whose contents remained unknown to him throughout the meeting. He also stated that he had

---

3. Agent Gordon also testified that Cantone had remarked, upon first seeing Agent Gordon, who was then carrying a brown paper bag, that he hoped that the bag did not contain a tape recorder.

4. Gourdet stated that before the commencement of the trial, he had gone to the District Attorney's office to work out a plea, and that, although he did not then enter into a plea, he had signed a cooperation agreement under which the District Attorney agreed to recommend a sentence of eight-and-one-third years to life in return for a plea to an A–II felony.

5. Gourdet also testified that the first time he saw cocaine was in March 1977 when Cantone showed him the drug.

6. There were numerous other witnesses for the prosecution. We have reviewed their testimony as excerpted in the appendix on appeal, and find that it is not helpful in assessing the extent to which the undisclosed matter was material to Cantone's defense.

brought a leather bag with him, and that the bag contained a loaded gun. On cross-examination, Cantone stated that Gourdet had given him a gun a couple of weeks earlier, and had asked Cantone to hold it for him.

Cantone also testified on cross-examination that he had filed no income tax return during 1976 or 1977, and that during 1977 his sole source of income was selling clothes, which resulted in earnings of approximately $2,000 between January and August 1977. Cantone also testified that when he loaned Gourdet $3,000 in the spring of 1977, he (Cantone) had accumulated only $4,500.[7]

*Summation at Trial*

On summation, Cantone's attorney attempted to discredit Gourdet's testimony. He stressed that, in entering into a deal with the government, Gourdet had revealed his mercenary nature and lost his credibility as a witness. Cantone's attorney also argued that Gourdet's testimony could not be trusted because the existence of the plea provided a tremendous incentive for Gourdet to provide testimony favorable to the prosecution in hope of obtaining more lenient terms. Finally, Cantone's attorney brought out that Gourdet had admitted to perjuring himself during the course of the trial.[8]

*Petitioner's Claims*

Our central concern on this appeal is certain information which the prosecution withheld from petitioner. The information came to the attention of Cantone's appellate counsel by chance, during the pendency of Cantone's appeal from his conviction.[9] The information withheld was described in the testimony of a government witness at an *in camera* hearing. This hearing was held, before the trial began, to allow the government to present evidence in support of its motion to close the courtroom during the testimony of Agent Gordon. Cantone and his counsel were excluded from that hearing. The record shows that a government informant testified at that hearing that Gourdet had told him—when they happened to meet in a bar—that he (Gourdet) was going to kill Agent Gordon. On the same occasion, Gourdet also threatened Agent Gordon's wife and the informant himself.

After receiving the transcript of the informant's testimony, Cantone's counsel submitted to the Appellate Division a sealed supplemental brief arguing that the petitioner had been prejudiced by the withholding of information that was material to

---

7. Quaranta also took the stand and testified that he was not involved in the transaction in Gourdet's basement, and that while he was there he was just trying "to catch a little nap." In other respects, Quaranta's testimony corroborated petitioner's.

There were three other witnesses for the defense. We have considered their testimony in reaching our decision regarding the materiality of the undisclosed information.

8. The following are excerpts from the summation presented by Cantone's attorney:

[G]reed is what got [Gourdet] into trouble. But now, he has the nerve to stay here and say well, I'm really not looking for a deal. I'm not really worried about going to jail. That man would burn his mother and sell the ashes.

What do you think he would do to save himself? Just what he has tried to do here. He sold his soul.

. . . .

Now, we get to this little agreement made with the District Attorney's office by Mr.

Gourdet. You know that's the agreement where if you tell us the truth, ... Alfred, we get to be the ones saying whether you are telling the truth or not. Then we will make recommendations for you.

. . . .

... You say what we want you to say. We will recommend a lifetime probation, Alfred. Not 50 years in jail, Alfred. Not 25 years in jail, Alfred.... No time in jail.

And Alfred, of course is going to work. You are going to work with us, Alfred. Alfred says well, I don't know anybody that deals in cocaine. Do you remember he says that on the stand? ...

If Alfred didn't know anybody that dealt in cocaine why are they offering him such goodies? ... He perjured. He perjured himself. Absolutely admitted perjury from that stand.

9. Because of a court reporter's error, Cantone's counsel on appeal was mailed a copy of the sealed minutes of this *in camera* hearing.

the credibility of Gourdet and exculpatory of Cantone. Petitioner's counsel noted that a motion for exculpatory material had been made in the trial court. In ¶ 9 of an omnibus discovery motion, Cantone had requested an order:

> Pursuant to CPL § 240.20(3) [sic], requiring the People to state whether or not defendant Gourdet or defendant Quaranta made any statement at all, whether oral or written, to any public servant engaged in law enforcement activity or to a person acting under his direction or in cooperation with him; and if any such statement was made, to reveal the exact contents of any such statement, and to supply any paper or document made by any public servant or his agent, in which any such statement is set forth or referred to in any way.

The trial court had granted Cantone's motion with respect to ¶ 9. After considering the argument that Cantone had been prejudiced by the withholding of information, the Appellate Division affirmed his conviction with opinion. 73 A.D.2d 936, 423 N.Y. S.2d 507 (1980). Leave to appeal was subsequently denied.

In his subsequent motion to vacate the judgment, petitioner for the first time raised the denial of his mistrial motion. The court denied his vacatur motion for failure to raise the issue on direct appeal. Discussing the substance of the motion at some length, however, the court concluded that the motion could not succeed on the merits. Petitioner unsuccessfully sought leave to appeal from this order. Finally, petitioner moved for reargument of his prior appeal from his conviction. In support of this motion, which was summarily denied, petitioner evidently raised the mistrial issue once again.

Acting *pro se*, petitioner then instituted this federal habeas action in which he asserted that he was deprived of a fair trial by the State's failure to disclose Gourdet's statement to the informant, and by the court's denial of his mistrial motion.[10] The district court granted the petition on the non-disclosure ground.

The court found that (1) petitioner had made a specific pretrial request for the undisclosed information in ¶ 9 of his discovery motion, and (2) the information was material under *Brady v. Maryland*. The court observed that petitioner's counsel had stated in his opening argument that petitioner had been a mere bystander to the sale arranged between Gourdet and Agent Gordon. The court reasoned that Gourdet's credibility as a witness was a critical issue in Cantone's defense, and concluded that the information withheld was vital to the issue of credibility and was therefore sufficiently material to require a new trial.

The court ordered that petitioner be released from custody unless he was afforded a new trial within ninety days. The State took this appeal[11] from the judgment granting the petition.[12]

## Discussion

### I. *The Nondisclosure Claims*

 In *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97. The failure of the prosecution to disclose information that would impeach a government witness may also deprive the defendant of a fair trial under the *Brady* rule. *See Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972);

---

**10.** *See infra* note 12.

**11.** This court granted the State's request for a stay of the district court's judgment pending appeal, pursuant to Fed.R.App.P. 8(a), and granted the State's request for an expedited appeal.

**12.** At the behest of petitioner, his brief on this appeal was prepared by two paralegals who are inmates at the correctional facility where petitioner is incarcerated. They also prepared papers in this action in the district court.

*United States v. Cody,* 722 F.2d 1052, 1061–63 (2d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); *United States v. DiFrancesco,* 604 F.2d 769, 774 (2d Cir.1979), *rev'd on other grounds,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980); *Ostrer v. United States,* 577 F.2d 782, 785 (2d Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1018, 59 L.Ed.2d 73 (1979); *see also United States v. Sperling,* 726 F.2d 69, 72–73 (2d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984). Nondisclosure of information will rise to the level of a constitutional violation, and require a new trial, only where that information is found to be material for the purposes of the due process clause.

The test for materiality, as initially set forth in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), distinguishes between three types of situations in which *Brady* is applicable. *Id.* at 103–07, 96 S.Ct. at 2397–99. This court has summarized the scheme set out in *Agurs* as follows:

> (1) where the undisclosed evidence shows that the Government's case includes perjured testimony and that the prosecutor knew, or should have known, of the perjury, (2) where the defendant made a specific request for particular undisclosed information, and (3) where the defendant made no request, or made only a general request.

*Ostrer,* 577 F.2d at 786. The *Ostrer* court also stated that

> when the Government's nondisclosure falls within either of the first two categories a strict standard of materiality should apply, with the defendant being entitled to a new trial if there is any reasonable likelihood that the evidence could have affected the outcome of the trial. *Agurs, supra,* 427 U.S. at 103–04 [96 S.Ct. at 2397–98].... On the other hand, if the defendant makes no request or only a general request for evidence that is then not disclosed (e.g., "all *Brady* material," "all exculpatory material"), he is entitled to a new trial only if the

undisclosed evidence, viewed in the context of the entire record, creates a reasonable doubt that otherwise would not exist. *Id.* at 112–13 [96 S.Ct. at 2401–02]....

*Id.; see also DiFrancesco,* 604 F.2d at 774 (where there has been a specific request for information withheld, the standard of materiality is whether the information might have affected the outcome of the trial).

In this case, the State argues that the district court was incorrect in its finding that petitioner's discovery motion contained a specific request for the undisclosed information. The State also argues that the information does not meet the standard of materiality applicable either to general or to specific requests.

Petitioner argues that as a result of the nondisclosure he is entitled to a new trial on two grounds. First, exculpatory material was withheld from him despite his specific request for it. Second, the undisclosed information indicated that the State's case included perjured testimony. Finally, petitioner argues that, in either case, the undisclosed information meets the applicable standard of materiality.

## A. *The First Nondisclosure Claim*

We find that, although petitioner's discovery motion constituted a specific request for the information withheld, that information does not meet the applicable standard of materiality. Thus, we find that the nondisclosure, standing alone, did not deprive petitioner of a fair trial.

### (1) *The Specificity of the Request*

The State's first contention is that the request was specific with respect to only certain information. The State argues that since Gourdet was a defendant when the discovery request was made, the request was specific with respect to information concerning the details of the crime charged—but *not* with respect to the information actually withheld. Alternatively, the State argues that if the request is to be read so broadly as to cover Gourdet's state-

ment, then it must be deemed a general, rather than a specific request. We disagree with both of the State's contentions.

■ The determination of whether a request was specific or general should be based primarily on the plain meaning of the language of the request. The fact that Gourdet was a defendant rather than a witness when the petitioner's discovery motion was made should not be determinative.[13]

■ The plain meaning of the request is this case covered Gourdet's statement to the informant. Given this plain meaning, it would be inappropriate to allow the government to impute a distinction between the meaning of the request when Gourdet was a defendant and its meaning if he had been a witness from the outset. It would authorize the government to exercise an inordinate amount of discretion in interpreting disclosure requests.[14]

The language in ¶ 9 was sufficiently particular to be deemed a "pretrial request for specific evidence," *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2398, exemplified by the specific request in *Brady v. Maryland.* In *Brady,* defense counsel had requested that the prosecution allow him to examine the extrajudicial statements made by defendant's accomplice. *See* 373 U.S. at 84, 83 S.Ct. at 1195. The government had disclosed some, but not all, of the statements sought. *Id.* The request in *Brady,* is, of course, now accepted as the Supreme Court's basic illustration of a specific request. *See Agurs,* 427 U.S. at 106, 96 S.Ct. at 2398.

In an interesting analysis, the first circuit has pointed out that "[a]lthough in *Brady* the Court made no point of it, the request called for *all statements of a designated individual,* and hence was, in fact, a 'specific' request." *United States v. DiCarlo,* 575 F.2d 952, 958 (1st Cir.1978), *cert. denied,* 439 U.S. 834, 99 S.Ct. 115, 58 L.Ed.2d 129 (1978) (emphasis added). The request in the case at bar is even more specific than such a demand since petitioner's request called for *all statements of a designated individual to certain third parties.* The first circuit also identified the following as "a classic example of a non-specific request as defined in *Agurs,*" *id.* at 959: "all material known to the government ... which is exculpatory in nature or favorable to the defendant, or may lead to the discovery of exculpatory material or material which may be used to impeach prosecution witnesses...." *Id.* at 958 (quoting request made in *United States v. McCrane,* 527 F.2d 906, 910 (3d Cir.1975)). This example is clearly broader than the request made by petitioner.

In *Ostrer v. United States, supra,* the pretrial request at issue was deemed to be a general request on the ground that it "amounted to nothing more than a boilerplate demand for 'all *Brady* material' or for 'anything exculpatory,' " 577 F.2d at 786 (quoting *Agurs,* 427 U.S. at 106–07, 96 S.Ct. at 2399). The disclosure request in *Ostrer* sought:

4) any other material in the possession of the Government bearing adversely on the credibility, character and reputation of Michael Hellerman [the key witness for the prosecution]; and 5) any other material relating to any matter which defense counsel could properly use in cross-examination to inquire into Hellerman's motive and bias in favor of the

---

**13.** It appears from the record that Agent Gordon learned of Gourdet's statement to the informant three or four months before the date of trial. The discovery motion was made one year before trial.

Of course, the government is under a continuing obligation to comply with a defendant's discovery requests. *See* N.Y.Crim.Proc.Law § 240.60 (McKinney 1982 & Supp.1984–1985).

**14.** Even, however, if Gourdet's posture as a defendant is taken into consideration, the infor-

mation at issue was within the scope of the request, and was exculpatory in nature. Gourdet's threat to kill Agent Gordon was germane to petitioner's defense when Gourdet was a co-defendant as well as when Gourdet was a witness for the prosecution. When Gourdet was a defendant, petitioner could have used the information in preparing his theory of defense, i.e., that he was an innocent party, and that Gourdet was the prime mover behind the drug transaction.

Government or expectation of favor from the Government.

577 F.2d at 786. Such a request, the court observed, "gives 'the prosecutor no better notice than if no request is made.'" *Id.* (quoting *Agurs,* 427 U.S. at 106–07, 96 S.Ct. at 2399).[15] The court went on to say that "[a] specific request ... is one similar to the request made in *Brady* itself—a request for 'specific information' that gives the prosecutor 'notice of exactly what the defense desire[s].'" 577 F.2d at 786–87 (quoting *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399) (footnote omitted).

In *United States v. Menghi,* 641 F.2d 72, 74 (2d Cir.), *cert. denied sub nom. Hilgert v. United States,* 451 U.S. 975, 101 S.Ct. 2058, 68 L.Ed.2d 356 (1981), this court found that the request by the defendant was a general request on the theory that it was no more specific than the request in *Ostrer.* The request in *Menghi* sought, *inter alia:*

> (4) all information concerning bad acts or crimes committed by the government informant not reflected in his arrest/conviction record.
>
> . . . .
>
> (6) Any evidence indicating non-reliability of the government informant.
>
> (7) Any evidence which might be used to impeach the credibility of the government informant or other government witnesses.
>
> (8) Any material relevant or useful to the preparation of the defense at trial including [requests for information not the subject of dispute ...].

*Id.* at 74 n. 1.

More recently still, in *United States v. Cody, supra,* this court determined that the defendant had not made a specific request for information regarding FBI threats to a government witness. The defendant had made two inquiries which he contended amounted to a specific request

for this information. First, the defendant had asked the government to state

> [w]hether the government intends to call an informant or accomplice as a witness at trial. If so, please identify him or her and set forth the following:
>
> . . . .
>
> (d) any and all records, memoranda and correspondence between the witness and law enforcement authorities which might reasonably reflect on the witnesses' motives and relationship with the government.

722 F.2d at 1062 n. 1, and second, he had asked the government to

> [s]et forth all information and evidence, which would tend to exculpate the guilt of the defendant or mitigate the degree of the evidence or reduce the punishment which information and evidence is within the knowledge of the government or which by due diligence could be discovered by or made known to the government.

*Id.* The court found that neither the first request for documentary materials, nor the second request, which the court said was "phrased in vague, catch-all terms," *id.,* constituted a specific request for disclosure of the undocumented fact that a witness had been threatened.

Finally, in *Wright v. United States,* 559 F.Supp. 1139 (E.D.N.Y.1983), *aff'd,* 732 F.2d 1048 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985), the district court found that petitioner had made a general rather than a specific request when he asked for "'all documents obtained by subpoena served upon defendant, school board, banks where defendant and/or his wife had an account, the Board of Education and [Behavioral Research Laboratories, Inc.].'" 559 F.Supp. at 1146. The court stated that "[t]he very breadth of this request ... demonstrates its generality: essentially it seeks the government's entire file." *Id.*

---

**15.** Even though the request in *Ostrer* was cast in quite broad terms, the court was divided over whether it constituted a general or a specific request. *See Ostrer,* 577 F.2d at 789–90 (Moore, J., concurring) (finding that the request was "specific").

The request made in the instant case is narrower and more particular than the requests that were found to be general in the above cases. The request here asked for all statements made by designated persons (Gourdet and Quaranta) to certain third parties (law enforcement agents or persons working with them). It asked "whether or not defendant *Gourdet* or defendant Quaranta *made any statement at all,* whether oral or written, *to any public servant engaged in law enforcement activity or to a person acting under his direction or in cooperation with him....*" (Emphasis added). This request is not "phrased in vague, catch-all terms," *Cody,* 722 F.2d at 1062 n. 1, nor does it amount to a request for "'all *Brady* material'" or for "'anything exculpatory.'" *Agurs,* 427 U.S. at 106, 96 S.Ct. at 2399; *see Ostrer,* 577 F.2d at 786.[16]

To find that this request is general rather than specific would be to adopt too narrow a definition of what constitutes a specific request. To do so would make it virtually impossible for a defendant to frame a specific request unless he already knew of the existence of the item and could therefore describe it with particularity. Even, however, without the benefit of *Brady,* a defendant is able to protect his interests where he knows that an item exists. Thus, if *Brady* is to be given effect, requests such as this—for all statements by a particular individual to certain third parties—must be deemed specific requests.

(2) *The Materiality of the Information Withheld*

▌ We now turn to the question of whether the information at issue meets the standard of materiality applied to information withheld despite a specific request. We find that it does not. We do not believe that the undisclosed information "might have affected the outcome of the trial." *Agurs,* 427 U.S. at 104, 96 S.Ct. at 2398; *DiFrancesco,* 604 F.2d at 774. We agree

with Judge Knapp that the undermining of Gourdet's credibility was central to Cantone's defense strategy. However, considering the information withheld—as we must—in light of the evidence actually presented to the jury, we do not believe that that information would have assisted Cantone's defense to any appreciable degree.

Gourdet's credibility was brought into question by petitioner's counsel during cross-examination and summation. It was brought out that he had previously been involved in drug transactions and that he was presently under indictment for two drug-related offenses. In addition, it was made clear to the jury that Gourdet had lied about his knowledge of individuals involved in the drug trade.

The jury was aware that Gourdet could receive a sentence of 15 years' to life imprisonment if convicted under the pending indictments, that Gourdet had entered into a cooperation agreement with the State in order to minimize the likelihood that he would receive an extended prison term upon conviction, and that Gourdet knew, specifically, that by testifying in the instant case he was improving his chances of receiving a light sentence.

Although Cantone was implicated in the crime by Gourdet's testimony, Cantone was equally implicated by the testimony of Agent Gordon. While Gourdet did corroborate Agent Gordon's testimony, Gourdet's story did not provide material crucial to the government's case. Gourdet's testimony included certain factual details, which provided a different explanation for Cantone's actions than was offered by Cantone. These details, however, were not essential to the case; rather, as the State argues, they were the icing on the cake. It should also be noted that Cantone's own credibility had been jeopardized on cross-examination.

---

**16.** Although the request in ¶ 9 tracks the statutory language of N.Y.Crim.Proc.Law § 240.-20(1)(a) (McKinney 1982 & Supp. 1984–1985), the similarity between the two is not relevant to

the question of specificity—i.e., to the question of whether the request gave the government notice that the undisclosed information was on demand.

Finally, the information withheld was not of a type likely to be given great weight by the jury. Gourdet's statement was a bare assertion, albeit a menacing one, delivered in a barroom encounter.

Even if the defense had made use of the information withheld, it appears quite certain that there would have been no effect on the outcome of the trial. Although it is possible that the jury would have discounted Gourdet's testimony to some degree, the verdict rendered would undoubtedly have been the same. Thus, the information withheld was not sufficiently material that its nondisclosure deprived petitioner of a fair trial under *Brady*.

### B. *The Second Nondisclosure Claim*

Finally, we are unpersuaded by petitioner's claim that the nondisclosure amounted to the suppression of perjurious testimony under *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935). Under *Mooney*, "a deliberate deception [by the state] of court and jury by the presentation of testimony known to be perjured," 294 U.S. at 112, 55 S.Ct. at 342, deprives the defendant of due process of law. Petitioner asserts that Gourdet perjured himself in describing his plea agreement to the jury, since his description made no reference to the possibility that he would be treated leniently in any prosecution arising from his threat to kill Agent Gordon. Petitioner contends that the jury should have been informed of the threat so that it could draw the inference that Gourdet had perjured himself in this regard.

We agree with Judge Knapp's view that there was insufficient evidence in the record to permit a finding of perjury. Even assuming, however, that petitioner had provided adequate factual support for his *Mooney* claim, he has not shown that the consequences of suppressing the alleged perjury—by withholding the information at issue—were sufficiently material to require a new trial. The standard of materiality applicable to the suppression of perjury is the same as the standard discussed above with respect to specific requests for the information withheld. *See Ostrer*, 577 F.2d at 786. Thus, for the reasons previously set out, petitioner has failed to show materiality for the purposes of his *Mooney* claim.

### II. *The Mistrial Claim*

As previously indicated, petitioner—in addition to presenting his nondisclosure claims to the district court—argued that the trial judge improperly denied his motion for a mistrial. The district court found that the mistrial claim was properly before it. We disagree; this claim was forfeited by procedural default in the state courts.

Petitioner first raised the mistrial claim after his direct appeal, in his motion to vacate the judgment of conviction. The trial court denied this motion on the ground that *inter alia*, petitioner was then barred from raising the issue since he had failed to do so on his direct appeal.[17] The Appellate Division also denied petitioner's subsequent motion to reargue his appeal. On that

---

**17.** The court denied this motion under N.Y. Crim.Proc.Law § 440.10(2)(c) (McKinney 1983), which provides:

> 2. Notwithstanding the provisions of subdivision one, the court must deny a motion to vacate a judgment when:
>
> ....
>
> (c) Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to

raise such ground or issue upon an appeal actually perfected by him....

The fact that the trial court addressed the merits of the motion does not weigh against our decision here. Where a state court has discussed both substantive and procedural issues and found that both warrant dismissal, the state court's ruling will be deemed to have been made on procedural grounds. *See Phillips v. Smith*, 717 F.2d 44, 50–51 (2d Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984).

Petitioner's request for leave to appeal from the denial of his vacatur motion was also rejected.

motion petitioner evidently raised this mistrial issue. Although the Appellant Division did not give reasons for its denial, the decision must be deemed to be based on a procedural bar since this ground was urged by the government. *See Edwards v. Jones,* 720 F.2d 751, 753–54 (2d Cir.1983), *cert. denied sub nom. Sanders v. Wasser,* — U.S. ——, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984); *Johnson v. Harris,* 682 F.2d 49, 51 (2d Cir.), *cert. denied,* 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1982); *Martinez v. Harris,* 675 F.2d 51, 54–55 (2d Cir.), *cert. denied,* 459 U.S. 849, 103 S.Ct. 109, 74 L.Ed.2d 97 (1982).[18]

Petitioner's procedural default in state court precludes him from raising the issue in a federal habeas proceeding unless he is able to show cause and prejudice. *See Wainwright v. Sykes,* 433 U.S. at 84, 97 S.Ct. at 2505; *Tsirizotakis v. LeFevre,* 736 F.2d 57, 62 (2d Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 216, 83 L.Ed.2d 146 (1984).

■ Petitioner advanced ineffective assistance of appellate counsel as cause for his default. To establish cause on this basis, however, petitioner must show that his counsel was ineffective for the purpose of the sixth amendment. *Id.* Petitioner has failed to make this showing.

In *Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983), the Court set out a framework for determining whether there has been ineffective assistance by appellate counsel. The Court noted that "[n]either *Anders* [*v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) ] nor any other decision of this Court suggests ... that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, de-

cides not to present those points." *Id.* 103 S.Ct. at 3312. The Court stated, in rejecting a *per se* rule that appellate counsel must raise every nonfrivolous issue requested by the client:

> This Court's decision in *Anders,* far from giving support to the new *per se* rule announced by the Court of Appeals, is to the contrary. *Anders* recognized that the role of the advocate "requires that he support his client's appeal to the best of his ability." 386 U.S., at 744, [87 S.Ct. at 1400] ... For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies *Anders.* Nothing in the Constitution or our interpretation of that document requires such a standard.

*Id.* 103 S.Ct. at 3313–14 (footnote omitted); *see Tsirizotakis,* 736 F.2d at 65.[19]

In his brief before the district court, petitioner enumerated three principal defects in his representation by appellate counsel, none of which rise to the level of ineffective assistance of counsel for the purpose of the present analysis. Indeed, only one of the three is relevant to petitioner's failure to raise the mistrial issue in a timely fashion. That defect involves his attorney's failure to raise the issue on appeal after allegedly agreeing to do so. Petitioner suggests that this failure constitutes cause under *Wainwright v. Sykes.*

Petitioner's argument, however, that the trial court erred in refusing to grant a mistrial lacks sufficient merit to support a claim that his appellate counsel rendered ineffective assistance by failing to raise the issue. This failure was not an error of constitutional dimension. Although de-

---

**18.** Petitioner's motion to reargue his appeal was brought on nearly twenty-two months after his conviction had been affirmed. A motion to reargue, however, must be made "within 30 days after the cause shall have been decided, except that for good cause shown, the court may consider any such motion when made at a later date." 22 N.Y.Codes, Rules and Regulations § 670.5 (1984).

**19.** *See generally Strickland v. Washington,* — U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (discussing analysis to be applied to ineffective assistance of trial counsel claims); *United States v. Cronic,* — U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (discussing extent to which certain factors provide a basis for finding that there was ineffective assistance of trial counsel).

fendant Quaranta obtained a reversal of his conviction on the ground that his mistrial motion was improperly denied, Quaranta's success is ultimately irrelevant to petitioner's argument on this issue. Petitioner's trial strategy differed significantly from Quaranta's.

Because petitioner's mistrial argument is weak, counsel cannot be faulted in retrospect for an omission which may well have been a proper exercise of his role, and a legitimate effort "to present the client's case in accord with [his] professional evaluation." *Jones*, 103 S.Ct. at 3312. It is undisputed that Cantone's counsel, who was retained, did in fact present four points in his brief: denial of Cantone's constitutional right to a public trial; prejudice resulting from the prosecutor's reference to other alleged widespread criminal conduct; prejudice resulting from the prosecutor's reference to Cantone's failure to call a witness; and, denial of a fair trial by a number of other errors and prosecutorial misconduct. There is no basis in the record for concluding that counsel's failure to include the mistrial issue in his brief was anything other than a reasonable professional judgment.

### CONCLUSION

Since we find that the information at issue, although improperly withheld, did not rise to the level of materiality which would warrant a new trial on either of the two grounds advanced by petitioner, and since we find that petitioner forfeited his mistrial claim by procedural default in the state courts, the judgment of the district court is reversed, and the cause is remanded for entry of judgment dismissing the petition. No costs.