[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 545 
 ON APPLICATION FOR REHEARING
This court's opinion of September 20, 1988 is withdrawn and the following is substituted therefor.
The appellant was indicted for the following three counts of capital murder: murder wherein two or more persons are murdered by one or a series of acts, § 13-11-2(a)(10), Code of Alabama
(1975) (repealed); murder committed during the course of robbery in the first degree, § 13-11-2(a)(2), Code of Alabama
(1975) (repealed); and murder done for a pecuniary or other valuable consideration or pursuant to a contract or for hire, § 13-11-2(a)(7), Code of Alabama (1975) (repealed).[1]
As a preface to our rendition of the facts of this case, it is noted that throughout the trial and on appeal the State's entire case against the appellant was based on the testimony of four witnesses whose credibility was highly questionable. One of the witnesses was subsequently determined to have perjured himself throughout this trial; another witness gave three inconsistent statements prior to testifying at this trial; and the remaining two witnesses had a combined total of 28 prior felonies. Apparently, the State's evidence, with the exception of a few bullets, was thrown out by the police department. Although the appellant's trial took place in 1986, the offense was committed in 1977 and, therefore, the witnesses were testifying concerning events which took place nine years prior to trial.
Dickie King testified pursuant to an agreement made with the district attorney's office, which was admitted into evidence. The agreement essentially stated that the State understood that King's entire role in the offense was that of a "middleman" who put Lee Jackson, the man who wanted the victims killed, in contact with the appellant, the "hit man." Pursuant to the agreement, Dickie King would not be prosecuted for his role in this offense, *Page 546 
provided that he cooperated fully with the State, that he testified against the appellant truthfully, and that his role in the offense was no more than he had indicated. Dickie King testified that he had been employed by Lee Jackson and that, during January 1977, Jackson approached him and asked if he knew anyone who would kill someone for approximately $5,000. King responded that his brother-in-law might be interested and could "keep his mouth shut." King testified that he thereafter found his brother-in-law, the appellant, cutting his brother's grass.[2] King asked the appellant if he would be interested in committing the murder. The appellant asked King how much money was involved and he replied, "Five thousand dollars." The appellant indicated that he was interested and King informed him that he should contact Lee Jackson at Campbell Construction Company, where he was working. King testified that two or three days after this conversation, he observed the appellant at the shop area of Campbell Construction Company, talking with Lee Jackson. King testified that he could not hear what was being said and had no further conversations with the appellant concerning the murder prior to the offense. King testified that he learned of the murders on a Monday and that, on the Saturday prior to that Monday, the appellant was at his house. The appellant and Diane Frazier, who subsequently became the appellant's common-law wife, had been staying with him. King testified that the appellant left the house at approximately 6:00 p.m. in a green Ford Torino automobile, which King had seen at Campbell's shop previously. He testified that the appellant returned in approximately three hours, accompanied by Grady Lambert. He stated that Lambert's face had red spots on it, which, after he cleaned up in the bathroom, were removed. He further testified that both Lambert and the appellant appeared to be "scared"; that the appellant and Diane Frazier went into the back room and talked; that when the appellant came out, he asked King to drive Lambert and him to the work release center, and that he did so and dropped Lambert off there; and that he then drove the appellant to a night club. King testified that the next morning, Lee Jackson contacted him and told him to take the green Torino up to a shopping center and to leave the keys in it, and that he would have it picked up. King testified that, several days later, he saw the appellant, who had been drinking. He testified that the appellant began discussing the murder and told him that Grady Lambert and he had killed the victims, Jessie and Irene Doughty. He stated that he had to wrestle Mr. Doughty back into the house and that the shootings had taken place in the kitchen. He further stated that he took $7,000 from Mr. Doughty.
Approximately a month prior to trial, Dickie King was picked up by the F.B.I. and the chief investigator for the district attorney's office. He was placed under arrest and subsequently informed that he was picked up for suspicion of being involved in the murders of Jessie and Irene Doughty. He then informed the authorities of his knowledge concerning the murders, and his agreement with the State was made.
King further testified that, aside from an incident involving a truck, he was never involved in any other illegal activities and that he was never involved in any other illegal activities with Lee Jackson. He testified that he did not own a gun around the time of the murders and that, although he helped the appellant get a job with Campbell Construction Company after the murders, he did not know why the appellant was subsequently fired. King admitted that he and the appellant had gotten in a fight over King's involvement with Diane Frazier.
The appellant's defense and trial strategy were predicated upon the theory that Dickie King had committed the murders.
Following the appellant's conviction, Dickie King testified for the State at the trial against Lee Jackson. After defense *Page 547 
counsel had begun his cross-examination of Dickie King and the court had recessed for the day, apparently the district attorney had Dickie King called to his office and indicated to him that he knew that King was lying. Dickie King then informed District Attorney Chris Galanos that he had in fact supplied the murder weapon, which was a gun he had gotten from Lee Jackson's son. He also admitted that he had received $1000 for his role in the offense. He further testified, during the trial against Lee Jackson, that he had also lied concerning the following testimony: he had stolen for Lee Jackson on several occasions; he had one or two other conversations with Lee Jackson after the Doughty killings; he knew that the appellant was fired by Lee Jackson several months after the killing because of a fight the appellant was involved in while he was in Birmingham; he spoke to the appellant on another occasion prior to the murder to determine how things were going and the appellant informed him that he could not find a weapon. Defense counsel indicated that Dickie King had asked several people, prior to the murders, the most effective way to commit a murder. Further, although Dickie King had testified that Lee Jackson contacted him by telephone on Sunday and told him to have the green Ford Torino moved to a shopping center, according to the city directory, Dickie King had no telephone at that time. Dickie King responded by testifying that he had a phone listed under the alias "Sammy King" because he had had trouble with the telephone company. However, according to the city directory, there was no phone listed to Sammy King.
Dickie King also testified, during Lee Jackson's trial, that despite his perjured testimony during the appellant's trial, his agreement with the State for non-prosecution remained intact. Because of the discovery of this perjury, District Attorney Chris Galanos nol-prossed the case against Lee Jackson. Furthermore, Grady Lambert, who was subsequently tried, was acquitted.
Diane Frazier, who was the appellant's girl friend at the time of the offense and subsequently became his common-law wife, testified for the State. She admitted having taken heroin on the day of the offense and to having a long history of drug abuse, addiction, and treatment. She also had three forgery convictions and one possession conviction. Prior to her testimony, she gave three inconsistent statements to the police. She gave her first statement in January 1980, when she signed a complaint against the appellant for assault. In this oral statement, Diane Frazier told Sergeant Farmer, of the Mobile Police Department, that her husband committed the murders. Sergeant Farmer testified that, although he recalled her giving the statement, no follow-up investigation was made pursuant to that information.
In 1981, she gave a written statement to the police when she was arrested for forgery. In that statement, she told Sergeant Farmer that at the time of the murders Dickie King drove his truck to within a few blocks of the Doughtys' residence. She stated that Grady Lambert, the appellant, and she were also present. She stated that Dickie King, Grady Lambert, and the appellant were admitted at the front door by Mr. Doughty; that they had come under the pretense that they were bringing him deer meat. She said that Doughty took the meat and went to put it in the freezer. She also stated that Lambert and the appellant walked through the victims' house taking things and found $4000 to $5000 in Mrs. Doughty's dresser drawer where her underwear was kept. She stated that the murder was planned by the appellant, Dickie King, and Lee Jackson at Campbell Construction. Following the murders, she stated, they returned to Dickie King's residence and the appellant and Grady Lambert behaved normally. She also told Sergeant Farmer that Dickie King would get $2,000 for the murders and that the appellant received $5,000, which he spent in three days on narcotics. She further told Sergeant Farmer in that statement that Dickie King had supplied the gun. Diane Frazier's forgery charges were nol-prossed.
After giving that statement, Diane Frazier returned to the appellant; in 1982 she filed for divorce. The divorce was never *Page 548 
finalized, and in December 1982, she was arrested for possession of narcotics. In early January 1983, she gave another written statement to Sergeant Farmer concerning the Doughty murders. In that statement Diane Frazier indicated that she drove with the appellant and Grady Lambert to the Doughtys' residence; that Mrs. Doughty opened the back door, which the appellant and/or Grady Lambert kicked in; that the appellant and Lambert ransacked the house; that Lee Jackson had told them to look in the top drawer of the master bedroom for cash or jewelry; that there was an exercise bike in the kitchen; and that they were paid after the offense, the appellant receiving $5000 and Grady Lambert receiving $3000. She further stated that, prior to the offense, they picked up Grady Lambert in Fairhope and drove around for 45 minutes to an hour. She stated that when Lambert and the appellant got back in the car after the killings, she did not see any money, and she indicated that Grady Lambert pulled the trigger.
On January 13, 1983, Diane Frazier gave another statement concerning the Doughty murders. She again stated that she was present when the murders transpired and that she received money for the killings. She again stated that she and the appellant picked up Grady Lambert in Fairhope and drove around. She described the house and stated that she saw a little light on the outside in the back of the house. She stated that Grady Lambert and the appellant went around to the back door and entered the kitchen. She said that the appellant had a gun, and she indicated that he shot Mrs. Doughty. She stated that the money that was taken was in $50 and $100 denominations. She then stated that, after the murders, they drove around, "scored" some dope, and drove Grady Lambert back to Fairhope.
Prior to trial, Diane Frazier took the police to the location where she said the gun was thrown into the water, but it was not found. She also allowed herself to be wired by the authorities and attempted to engage in conversations concerning the offenses with Dickie King and Lee Jackson.
At trial, she testified that her previous statements were not true. She testified that, prior to the murders, the appellant indicated that he had the opportunity to be involved in something "big." On the night of the murders, she testified, the appellant, Dickie King, King's then-wife, and she were all present at Dickie King's house. She testified that the appellant left alone around dusk and, when he returned, took her into the bedroom and told her that it was over. The following day, she testified, the appellant told her that he had a gun which needed to be disposed of. She testified that she threw the gun over a bridge and into the water close to the Fowl River. She testified that she heard about the murders on a news broadcast and called the appellant on the phone. Some time thereafter, she testified, the appellant described the inside of the Doughty's home to her; that he informed her that there was an exercise bicycle in the kitchen, as well as a bar; that he further told her that the victims were shot in the upper head and neck area; and that he explained that they got into the house because Lee Jackson had called the Doughty home in advance, stating that he was sending some people over with deer meat for Mr. Doughty. She testified that the appellant told her that Lee Jackson gave him approximately $5000 for committing the murders. She further testified that the appellant and she had gotten money from Lee Jackson periodically throughout the years and as recently as the month before this indictment was returned. She testified that she did not know why she had lied in the prior statements, but that she did not go with them to commit the offenses, nor did she ever see Grady Lambert on the night in question.
Dalton Sheffield testified that he had been friends with the appellant and Grady Lambert most of their lives. He testified that he had previously been convicted of 15 felonies and was presently serving a life sentence. He stated that in return for his testimony, he had been promised federal witness protection and concurrent time for *Page 549 
an armed robbery charge.[3] He said that in March 1977, he had a conversation with the appellant in which the appellant showed Sheffield a "faded red" Volkswagen dunebuggy; that the appellant informed Sheffield that he and Grady Lambert had made a "hit" for Lee Jackson and that they had "made pretty good for it." Sheffield said he asked if the appellant was referring to the Doughty murders and he responded that he was. Sheffield said that the appellant told him that Lee Jackson wanted Mr. Doughty killed because he had "screwed" Jackson on a construction deal and that Mrs. Doughty was killed because she happened to be there at that time. One of the Doughtys' sons testified that, at the time of his death, Mr. Doughty owned two Volkswagen beach buggies and that Lee Jackson got the reddish-orange one.
Richard Johnson testified that he had been convicted of 13 burglaries and one misdemeanor for burning personal property. He testified that he had grown up with Grady Lambert and the appellant. At the time of the murders, he was living in the Mobile Work Release Center, as was Grady Lambert. Johnson testified that on the Saturday of the murders he had a pass from the work release center, but that Grady Lambert did not. He testified that the appellant came to the work release center and asked Lambert if he wanted to do a job with him; that when Lambert asked what the job was, the appellant informed him that there was a house on Highway 90 where he could get some money; that Lambert told the appellant to wait until the authorities "counted," because it would then be several hours until the next count. Johnson further testified that the appellant told Lambert that a contractor had informed him about the house; that Lambert then asked Johnson if he would cover for him because he was going to do a job with the appellant; that Lambert asked Johnson to walk downstairs with him to the basement, which he described as ground level, where a window was located through which they would come and go; that Lambert climbed up a piece of plywood, which leans against the window, and crawled out; that Lambert had told the appellant to meet him down the block; that the appellant was driving a green car; that when Lambert returned, he entered the building through the window again; and that Lambert told Johnson that the appellant had dropped him off a block away. Johnson further testified that when Lambert left the work release center, he had no money, but that when he returned, he had "a wad of hundred dollar bills." He described Lambert as "real nervous and real red looking" and "shaking real bad." He further testified that he saw the appellant again that night and that he appeared to be nervous. He testified that, on the following day, the appellant returned "to go get . . . some more heroin"; that he asked Lambert if he had told Johnson about "it" and Lambert responded that he had. Johnson testified that they were talking about all of the guns in the house. He further testified that the appellant said that one of the guns had a gold trigger.[4] Johnson said that Lambert asked the appellant what he did with the pistol and the appellant stated that he threw it in some water; that the appellant stated that Mrs. Doughty had started screaming, so he slung her on the floor and shot her. Johnson also testified that the appellant had stated that there was a bunch of oysters on the bar[5] and said "something about deer." Johnson also testified that the appellant stated that they got $10,000 for killing the Doughtys and that he split it with Grady Lambert; that the appellant indicated that the money came from a gray tin box they found at the *Page 550 
Doughtys' residence,[6] and that the appellant also stated that Mr. Doughty owed the contractor a lot of money and would not pay him, so the contractor wanted him killed. On cross-examination, defense counsel presented records from the work release center indicating that Johnson left the work release center around 1 o'clock on the day in question and did not return until 8:30 p.m. However, Johnson testified that he came and went during the day.
Throughout the trial, the appellant's defense was that he did not commit the crime and that the witnesses were lying. His defense indicated that Dickie King actually committed the murders.
 I
The appellant argues that it was error for the trial court to strike for cause the jurors with fixed opinions against capital punishment. However, the United States Supreme Court has held that such an exclusion of prospective jurors does not violate a defendant's Sixth Amendment rights to an impartial jury and to a jury selected from a cross-section of the community.Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758,90 L.Ed.2d 137 (1986).
 II
The appellant argues that Alabama's capital punishment statute, which he cites as § 13A-5-39, et seq., violates Article I, Section 11, of the Constitution of Alabama 1901. Specifically, he argues that the constitution is violated because Alabama's present capital punishment statute renders the jury's verdict merely advisory and gives the trial court the final determination of whether the defendant in a capital murder case should die. He further argues that the statute is unconstitutional by allowing the jury to recommend death by a vote of ten of the jurors, whereas at the time of the adoption of the constitution a unanimous jury verdict was required in order to put a defendant to death. The appellant is actually challenging the 1981 capital murder statute, despite the fact that his crime occurred in 1977 and he was convicted under the 1975 statute, as modified by Beck v. State, 396 So.2d 645
(Ala. 1980).
It is clear that, even where the offense occurred before July 1, 1981, the trial court has the authority to sentence a defendant to death, despite the jury's recommendation of life without parole. Ex parte Hays, 518 So.2d 768, 775-77
(Ala. 1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099,99 L.Ed.2d 262 (1988). Furthermore, where an appellant argued that the capital murder statute is unconstitutional because it permits the trial court to override the jury's sentence recommendation, this court has ruled adversely to the appellant. Crowe v. State, 485 So.2d 351, 365
(Ala.Cr.App. 1984), reversed on other grounds, 485 So.2d 373
(Ala. 1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3284,91 L.Ed.2d 573 (1986), citing Ex parte Jones, 456 So.2d 380
(Ala. 1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779,84 L.Ed.2d 838 (1985); Ex parte Lindsey, 456 So.2d 393 (Ala. 1984), cert. denied, 470 U.S. 1023, 105 S.Ct. 1384, 84 L.Ed.2d 403
(1985); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154,82 L.Ed.2d 340 (1984). This court in Crowe reasoned that "[s]ince the jury had no role in sentencing at common law, no such role is required by the original or any subsequent embodiment of the inviolability clause. Therefore, the advisory nature of the jury's sentence verdict under § 13A-5-46, Code of Alabama
(1975), is not violative of Article I, Section 11." Crowe, at 364. The same historical reason would apply to Alabama's preceding statute as modified by Beck v. State, supra.
Although the appellant argues that allowing a jury to recommend death based on a 10 to 2 vote, rather than only on a unanimous vote, also violates Article I, Section 11, this argument is inapplicable to the appellant. The appellant was convicted under the 1975 capital murder statute, as modified byBeck v. State, supra, and under *Page 551 
that statute a unanimous jury vote was required to recommend death. See Beck v. State, supra, at 663. Furthermore, as noted previously, the jury had no role in sentencing at common law and, therefore, no particular numerical vote could be required by Article I, Section 11. See Crowe v. State, supra, at 364.
 III
The appellant argues that Alabama's process for weighing the aggravating and mitigating circumstances under its capital murder statute results in arbitrary inflictions of the death penalty and is therefore unconstitutional. Again, the appellant was actually convicted under the 1975, statute as modified byBeck v. State, supra; however, the statutes are essentially the same regarding the process for the weighing of aggravating and mitigating circumstances. Cf. Beck v. State, supra, at 662-63, and § 13A-5-48, Code of Alabama (1975). The argument that the 1981 capital statute does not provide "clear and objective standards" that provide "specific and detailed guidance" and therefore that the statute results in the imposition of the death penalty in an arbitrary and capricious manner, has been rejected by this court. Thompson v. State, 542 So.2d 1286
(Ala.Cr.App. 1988). See also Crowe v. State, 485 So.2d 351,364-65 (Ala.Cr.App. 1984), reversed on other grounds,485 So.2d 373 (Ala. 1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3284,91 L.Ed.2d 573 (1986). For the same reasons as stated in those cases, the argument based on the 1975 statute is without merit.
 IV
The appellant argues that the trial court erred in denying his motion for new trial. His motion was based on the discovery, during Lee Jackson's trial, of the perjured testimony of Dickie King; evidence that the green Ford Torino, which Dickie King and Richard Johnson both testified the appellant used to commit the murders, was in fact in a car shop being repaired at the time of the offense; and the testimony of two witnesses that Dalton Sheffield was intentionally lying about the appellant's involvement in the murders so that he could get concurrent time on his armed robbery charge, as promised by the district attorney's office.
The evidence presented by the appellant at his hearing on his motion for new trial, which indicated that the green Ford Torino belonged to a friend of the victim and was in an auto shop at the time of the offense, does not entitle the appellant to a new trial on the basis of newly discovered evidence.
 "To establish the right to a new trial based on newly discovered evidence, the appellant must show: (1) that the evidence will probably change the result if a new trial is granted; (2) that it has been discovered after the trial; (3) that it could not have been discovered before the trial by the exercise of due diligence; (4) that it is material to the issue; and (5) that it is not merely cumulative or impeaching."
Isom v. State, 497 So.2d 208, 212 (Ala.Cr.App. 1986), and cases cited therein.
Newly discovered evidence that the appellant was not driving a green Ford Torino would not change the result of the trial, nor is it material to the issue. Diane Frazier testified that she believed the appellant owned a pink and white vehicle and that he might have been driving that automobile at the time of the offense. Thus, this newly discovered evidence would have served only to impeach Dickie King's testimony that the appellant was driving a green Ford Torino on the night of the offense and Richard Johnson's testimony that the appellant was driving a green car.
The testimony of the two witnesses that Dalton Sheffield admitted lying about the appellant's involvement in the offenses, in return for concurrent time on a charged offense, was also not sufficient newly discovered evidence to entitle the appellant to a new trial.
 "Evidence tending merely to impeach or contradict a State witness as to the testimony given upon the trial is generally not such newly discovered evidence as would warrant the granting of a new *Page 552 
trial. O'Pryor v. State, 237 Ala. 13, 13-14, 185 So. 374 (1938). In this case, the impeaching testimony would not tend 'to destroy or obliterate the effect of the evidence upon which the verdict rested.' Reynolds v. City of Birmingham, 29 Ala. App. 505, 507, 198 So. 360, 362 (1940)."
Dossey v. State, 489 So.2d 662, 666 (Ala.Cr.App. 1986). See alsoBorden v. State, 522 So.2d 333, 335-36 (Ala.Cr.App. 1988) (wherein the appellant sought to introduce evidence that the State's "most material witness" had perjured himself in testifying that he had not been offered immunity from any prosecution).
Both of the witnesses who testified that Sheffield had told them of his lies, stated that they gained their information while they were inmates with Sheffield at Holman Prison. Ellis Luker, who was still in Holman Prison, had been convicted of assault with intent to murder, receiving stolen property, five burglaries in Alabama, a breaking and entering larceny in North Carolina, possession of cocaine, and several escapes. Danny Moulds, the other witness, testified that Sheffield also asked him to support his lies by so testifying. Moulds was currently serving a life without parole sentence for capital murder. He had also been convicted of drug offenses, robbery, and three escapes.
 " '[T]his court will indulge every presumption in favor of the correctness' of the trial judge's decision. Troha v. State, 462 So.2d 950, 952
(Ala. Cr. App), reversed on other grounds, 462 So.2d 953 (Ala. 1984), on remand, 462 So.2d 954
(Ala. 1985.) The trial court is in the best position to determine the credibility of the new evidence. Snider v. State, 473 So.2d 579 (Ala.Cr.App. 1985); Robinson v. State, 389 So.2d 144 (Ala. Cr. App), cert. denied, 389 So.2d 151 (Ala. 1980.) 'The trial court is the factfinder in a hearing on a motion for new trial. One condition of the trial court's granting a new trial on the basis of newly discovered evidence is that the court must believe the evidence presented at the hearing.' McDonald v. State, 451 So.2d 440, 442 (Ala.Cr.App. 1984)."
Isom v. State, 497 So.2d 208, 212 (Ala.Cr.App. 1986). SeeWilliams v. State, 489 So.2d 4 (Ala.Cr.App. 1986) (wherein the appellant presented the testimony of two inmates who had both previously been convicted for crimes involving moral turpitude and who allegedly gave the appellant new information while they were confined in the same penal facility with the appellant). See also Siniard v. State, 491 So.2d 1062, 1064-65
(Ala.Cr.App. 1986) (wherein the testimony of two witnesses at the appellant's motion for new trial consisted chiefly of information tending to impeach the credibility of a State witness who had testified against the appellant at trial and, therefore, did not provide a basis for granting a new trial). The trial court properly denied the motion for new trial, based on lack of the witnesses' credibility.
The discovery of the perjured testimony given by Dickie King also did not entitle the appellant to a new trial.
 "In order to obtain a new trial on the basis of the use of perjured testimony by the State, a defendant must allege and prove (1) that the testimony was perjured; (2) that it was on a matter of such importance that the truth would have prevented a conviction; (3) that the State had knowledge that the testimony was perjured; and (4) that the defendant was not negligent in discovering the falsehood and in raising the issue. [Citations omitted.] This is in addition to meeting the requirements for establishing the right to a new trial on the basis of newly discovered evidence. Barnes v. State, 415 So.2d 1217 (Ala.Cr.App. 1982)."
Baker v. State, 477 So.2d 496, 504 (Ala.Cr.App. 1985), cert. denied, 475 U.S. 1029, 106 S.Ct. 1231, 89 L.Ed.2d 340 (1986). (Emphasis in original.)
The appellant has not met his burden of proof, because he has neither shown that the State had knowledge that the testimony was perjured nor shown that it was on a matter of such importance that the truth would have prevented a conviction. Dickie King testified at Lee Jackson's trial that the district attorney's office was not aware *Page 553 
that he had perjured himself. District Attorney Galanos testified at the appellant's motion for new trial that he did not know that Dickie King had perjured himself in the appellant's trial until the night following his first day of testimony in Jackson's trial. Galanos testified that he became aware of Dickie King's untruthfulness in testifying when Lee Jackson's attorney indicated, through his questioning, that several people had seen Dickie King with a gun around the time of the murders. Immediately after the district attorney's office became aware of the perjury, the court was contacted and Lee Jackson's defense counsel was also informed of the perjury.
Although Dickie King perjured himself on a number of aspects concerning the murders, he still maintained that the appellant committed the offenses and, although that testimony shows that Dickie King was actually more involved in the offenses than he originally indicated, none of the perjured testimony concerned the appellant's role in the offenses. Therefore, the perjured testimony would not have affected the appellant's conviction or the jury's finding of his guilt. See Thomas v. State,539 So.2d 375 (Ala.Cr.App. 1988) ("Here, the excluded evidence would not have exonerated this appellant. It was merely evidence that [a witness] may have also been present at the victim's house on the night in question and may have also participated in her death. This evidence is in no way inconsistent with the appellant's guilt. In fact, it is more consistent with the appellant's guilt because this evidence placed him at the scene of the crime!"). As in Thomas, King's later testimony actually further supports the appellant's guilt. He has now testified that he personally gave the appellant the murder weapon to use on the victims and that he received money for his participation, not from Lee Jackson, but from the appellant.
The appellant argued at trial that Dickie King probably committed the offense. He now argues that the trial court should accept King's recantation of some of his testimony at the appellant's trial and then disbelieve the rest of his testimony concerning the murders, despite King's testimony that the rest of his rendition at appellant's trial was true and correct. Cf. Wadsworth v. State, 507 So.2d 572
(Ala.Cr.App. 1987) (where petitioner in a coram nobis proceeding in effect argued that a witness's testimony against him was perjured because he had made a deal with the authorities in exchange for his testimony and asked the circuit court to believe that recanted testimony, but disbelieve the witness's testimony concerning his participation in the robbery).
The appellant argues that the jury's acquittal of Grady Lambert following the revelation of Dickie King's perjury indicates that the jury may likewise have acquitted him. However, as argued by the State, each trial is different and must be distinguished by the evidence presented at each trial which indicates the particular defendant's guilt. In the present case, Diane Frazier, the appellant's own wife, testified that he admitted committing the offenses, as did Dalton Sheffield and Richard Johnson. There was sufficient evidence presented at trial to support the jury's verdict.
" 'The discovery, at a time subsequent to the date of the trial, that testimony which was introduced thereat was perjured may not be sufficient to support a granting of the writ or a motion for new trial.' " Wadsworth v. State, supra, at 575, and cases cited therein. In Smitherman v. State, 521 So.2d 1050
(Ala.Cr.App. 1987), the appellant claimed that he was entitled to a new trial because a former police officer, the primary witness who testified against him, was being investigated concerning improprieties in other drug investigations that were going on at the time when he arranged the marijuana buy from the appellant and when he subsequently testified against the appellant. This court stated that "it is significant to note that, while [the police officer] was the only eyewitness to involve the defendant in the actual sale of marijuana, he was not the only witness to incriminate him." In the present case, aside from the testimony of Dickie King, there was evidence of the appellant's guilt from the testimony of Diane *Page 554 
Frazier, Richard Johnson, and Dalton Sheffield.
Because the record contains no evidence that the prosecutor knowingly used perjured testimony to obtain a conviction or that the perjured testimony was on a matter of such importance that the newly discovered evidence prevented a conviction, this court cannot find any abuse of discretion by the trial court in denying the appellant's motion for new trial.
 V
The appellant argues that the district attorney committed reversible error by failing to inform the appellant of certain subsistence payments which were made to Richard Johnson and Diane Frazier prior to their testimony in this case. That evidence was revealed during the subsequent trial of Grady Lambert. Richard Johnson received approximately $1,000 in subsistence payments from the district attorney's office during the late winter and early spring of 1986. Diane Frazier testified that she received no payments from the district attorney's office; however, she testified that she received an undisclosed amount of money from the F.B.I. for living expenses during the fall of 1985.
On cross-examination, during the trial of Grady Lambert, Richard Johnson testified that, after the appellant's trial, he was staying at a Salvation Army facility. Thereafter, he testified that the district attorney's office wanted to make sure that he was out of Alabama, and bought him a bus ticket to Colorado. He said that the district attorney's office then bought his bus ticket back to Mobile in May and that he lived at the Salvation Army facility. He initially testified that, during the time he was in Colorado, no one provided him with living expenses; however, he said, the district attorney's office provided him with tools so that he could work. He stated that the tools cost approximately $300. He then testified that the district attorney's office did pay his rent for two months and provided him with money for groceries and necessities. He stated that, in all, the district attorney's office provided him with approximately $1000 while he was in Colorado. He testified that, after he returned to Mobile, he was given $50. He said he then ended up in the Satsuma jail, where he received no money, and was later placed in the Cullman jail, where he received $100. Johnson said that all of the money which he testified to having received from the district attorney's office was given to him after the appellant's trial. Moreover, there is no indication in the record that any of these payments were made pursuant to a deal arranged at the time of the appellant's trial. See United States v. Lacayo, 758 F.2d 1559,1563 (11th Cir. 1985), cert. denied, 474 U.S. 1019,106 S.Ct. 568, 88 L.Ed.2d 553 (1985) (wherein the court held that "[t]o warrant a new trial, the agreement of leniency [or any 'deal' made between the witness and the government] must have been reached prior to the witness's testimony," quoting UnitedStates v. Ramirez, 608 F.2d 1261, 1266 (9th Cir. 1979)).
Aside from the fact that there were no payments made at the time of the appellant's trial which could have been disclosed by the prosecutor,[7] the payments were also not material under the standards set forth in United States v. Bagley,473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481, (1985). The Court inBagley quoted United States v. Agurs, 427 U.S. 97,96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), explaining that the holding inBrady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), indicates that the requirement of materiality means that the suppressed evidence might have affected the outcome of the trial. "Suppressed evidence useful only for impeachment purposes is material if its disclosure probably would have resulted in acquittal." *Page 555 United States v. Darwin, 757 F.2d 1193 (11th Cir. 1985), cert. denied, 474 U.S. 1110, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986) (wherein the court held that additional evidence concerning the involvement of one of the State's witnesses in a drug transaction was not material where the appellant had already been able to question the witness's credibility and bias before the jury). Material evidence is that which " 'creates a reasonable doubt that did not otherwise exist,' " United Statesv. Agurs, 427 U.S. at 112, 96 S.Ct. at 2401, and its omission "must be evaluated in the context of the entire record." Careyv. Duckworth, 738 F.2d 875, 877 (7th Cir. 1984) (wherein the court held that the prosecutor's failure to disclose completely the deal between the State's witness and the D.E.A. would not have created a reasonable doubt that did not otherwise exist in the minds of the jurors, especially in light of previously admitted impeaching evidence). Impeaching testimony against State's witnesses has been held to fail to satisfy the materiality requirement of Brady where the witness had previously been impeached, because "[a]lthough it is possible that the jury would have discounted [the witness's] testimony to some degree, the verdict rendered would undoubtedly have been the same." Cantone v. Superintendent, New YorkCorrectional Fac., 759 F.2d 207, 217 (2d Cir. 1985), cert. denied, Cantone v. Scully, 474 U.S. 835, 106 S.Ct. 109,88 L.Ed.2d 89 (1985). See also United States v. Ramos Algarin,584 F.2d 562, 566-67 (1st Cir. 1978) (wherein the court held that because the witness's credibility was already subject to close scrutiny, the disclosure of an even more favorable agreement between the witness and the State would not, in any reasonable likelihood, have affected the jury's appraisal of the appellant's guilt).
Additionally, this case is distinguishable from Giglio v.United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104
(1972). In Giglio, an unindicted co-conspirator's testimony provided the only link between the appellant and the crime. The State's case "depended almost entirely on [his] testimony; without it there could have been no indictment and no evidence to carry the case to the jury." Id. at 154, 92 S.Ct. at 766. The State indicated that the witness had received no promises of leniency; however, after the trial, the defense discovered evidence which indicated that the co-conspirator had been promised immunity prior to trial. The Court ruled that due process required a new trial and that, "[w]hen the 'reliability of a given witness may well be determinative of guilt of innocence,' nondisclosure of the evidence affecting credibility falls within [the Brady rule requiring a new trial regardless of the prosecution's good or bad faith]." Id. at 154,92 S.Ct. at 766, quoting Napue v. Illinois, 360 U.S. 264, 269,79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). "A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.' " Giglio,405 U.S. at 154, 92 S.Ct. at 766, quoting Napue v. Illinois,360 U.S. at 271, 79 S.Ct. at 1178.
Evidence that Richard Johnson was provided with money from the district attorney's office after the appellant's trial does not satisfy the materiality requirement of Brady. This is true especially because Johnson's credibility had already been attacked by his prior convictions and the admission into evidence by the defense of records from the work release center indicating that Johnson was absent from the facility from 1 o'clock p.m. until 8:30 p.m.
Although Diane Frazier indicated that she received money for living expenses from the F.B.I., she testified that she received no payments at all from the district attorney's office. The record contains no indication that the district attorney's office was aware of the payments made by the F.B.I. and, therefore, no failure to disclose has been shown. Furthermore, the payments were not material, because there is no reasonable probability that, had the defendant known of these payments, the result of the trial would have been different. It is highly improbable that she was testifying against her husband in return for the payments, as she had given a statement incriminating her husband to the police as early as 1981. Moreover, Diane Frazier's credibility was *Page 556 
called into question on both direct and cross-examination because of her prior inconsistent statements, prior convictions, and drug addictions.
Therefore, neither did the prosecution fail to disclose this evidence, nor was it material to the appellant's case. SeeHarper v. State, 249 Ga. 519, 292 S.E.2d 389, 398 (1982) (wherein the court held that a $75 payment made by the F.B.I. to a key government witness was not sufficient newly discovered evidence to merit a new trial because it was not so material that it would probably produce a different verdict).
 VI
The appellant argues that the trial court erred in sustaining the State's objection to defense counsel's offer to place into evidence newspaper articles containing reports of the murders. The appellant argues that an important part of the State's case revolved around certain witnesses' testimony concerning specific details of the offense. The witnesses testified that they were told about these details by the appellant, and the State argued that they could have learned these facts only from someone who had committed the offense. The appellant argues that the newspaper articles actually contained those details and, therefore, that the witnesses might have learned the details by reading the articles. However, the articles did not impeach the witnesses' testimony, nor were they relevant.[8]
Although the State's witnesses testified to certain details which they alleged that they learned from the appellant, they were never asked if they read the newspaper and never denied learning the details from the newspaper. There was no evidence in the record connecting these witnesses to the newspapers. Therefore, the articles could not impeach the witnesses' testimony, as they did not disprove or cast doubt on any aspect of their testimony.
 "There are five main lines of attack upon the credibility of a witness. The first, and probably the most effective and most frequently employed, is an attack by proof that the witness on a previous occasion has made statements inconsistent with his present testimony. The second is an attack by a showing that the witness is biased on account of emotional influences such as kinship for one party or hostility to another, or motives of pecuniary interest, whether legitimate or corrupt. The third is an attack upon the character of the witness. The fourth is an attack by showing a defect of capacity in the witness to observe, remember or recount the matters testified about. The fifth is proof by other witnesses that material facts are otherwise than as testified to by the witness under attack."
McCormick, Evidence § 33 (2d ed. 1972).
Because of the lack of connection between the witnesses and the newspaper articles, none of the methods of impeachment is applicable.
Furthermore, the articles were not relevant in this case, as they were not sufficiently tied to the evidence. "Relevancy is the determination of whether there is sufficient connection between fact A and inference B to allow the fact to be placed before the jury." C. Gamble, McElroy's Alabama Evidence § 21.01 (3d ed. 1977). The test employed in Alabama "is that fact A is relevant if there is any logical relationship between it and the ultimate inference B for which it is offered." Id. In the present case, fact A, the newspapers containing accounts of the murders, has no logical relationship to the ultimate inference B, that the appellant did not disclose the details of the offense to the witnesses.
 " ' "Evidence to be competent and admissible must be relevant. That is to say, evidence must tend to prove or disprove the issues before the jury. The determination of the relevancy or lack of relevancy of particular evidence rests largely in the sound discretion of the trial judge. It is, therefore, the duty of the trial judge to limit evidence to the points in issue so that the attention of *Page 557 
the jury is not distracted, nor withdrawn from the primary issues, to be directed towards foreign matters or issues of questionable or doubtful relevancy. . . ." '
 " 'The trial court may exclude evidence when it is such as to furnish a basis for nothing more than mere conjecture or remote inferences in reference to the transaction under investigation. Hadnot v. State, 3 Ala. App. 102, 57 So. 383, 384
(1912).' "
Jennings v. State, 513 So.2d 91, 97 (Ala.Cr.App. 1987), quotingTrawick v. State, 431 So.2d 574, 578 (Ala.Cr.App. 1983).
While the newspaper accounts contain some of the details testified to by the witnesses, without more, the jury could only speculate that the witnesses may have read the articles and further speculate that the source of their testimony concerning the details was the articles. The trial court did not abuse its discretion in failing to allow the articles into evidence, where the jury would have been relegated to mere conjecture or remote inferences.
 VII
Pursuant to Rule 45A, Alabama Rules of Appellate Procedure, we have reviewed the record to determine whether any plain error or defect in the proceedings occurred which would have probably "adversely affected the substantial right of the appellant." Rule 45A, A.R.A.P. In so doing, this court notes that the trial court, without objection, failed to charge the jury that Dickie King was an accomplice as a matter of law. Although Dickie King's entire role in the murders was unknown during the appellant's trial, the evidence in that trial nevertheless showed that Lee Jackson informed Dickie King that he wanted to have a murder committed and asked King to recommend someone who would do the job for $5000 and who could "keep his mouth shut"; that King then suggested the appellant and subsequently approached the appellant with the proposition; that King testified to the details of the night on which the offense was committed, although it had occurred nine years prior to trial; that he drove Grady Lambert back to the work release center and took the appellant to a bar; and that the next day, upon instruction from Lee Jackson, he drove the car, in which the appellant had left the following night, to a shopping center, where he left the car to be picked up.
Dickie King's knowledge that a murder was intended to be committed and his suggestion of a murderer and further solicitation of the murderer, sufficiently established a particularized intent to kill. Kennedy v. State, 472 So.2d 1092
(Ala.Cr.App. 1984), affirmed, 472 So.2d 1106 (Ala. 1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985);Watkins v. State, 495 So.2d 92 (Ala.Cr.App. 1986) (prior cases for a discussion of "particularized intent to kill".)
 "The accomplice is criminally responsible for acts which are the direct, proximate, natural result of the conspiracy or are a foreseeable consequence of the conspiracy.
 " 'Every person engaging in a joint enterprise is not automatically and equally guilty of a crime committed independently by another participant in the venture. A conspiracy necessary to fix guilt on all participants must be one in which all have a meeting of the minds (though only for an instant) to commit the crime charged. A different crime independently committed and not a foreseeable consequence of the conspiracy can hardly be charged to one who neither participated in its commission, nor aided therein, although all originally started out on some other illegal venture.' Howell [v. State, 339 So.2d 138, 139 (Ala.Cr.App. 1976)](emphasis added)."
Allen v. State, 462 So.2d 1031, 1033 (Ala.Cr.App. 1984).
In order to be an accomplice, some legal evidence must imply that " 'he either recruited, helped or counseled in preparing the [crime] or took or undertook some part in its commission.' " Payne v. State, 487 So.2d 256, 262 (Ala.Cr.App. 1986). An accomplice is one who is a partner in crime and includes an accessory before the fact, especially in view of the abolition of *Page 558 
the distinction between accessories before the fact and principals. Cooper v. State, 43 Ala. App. 385, 191 So.2d 224, cert. denied, 280 Ala. 711, 191 So.2d 229 (1966); Alexander v.State, 20 Ala. App. 432, 102 So. 597 (1925). A witness is to be considered an accomplice for the purposes of § 12-21-222, Codeof Alabama (1975), which requires corroboration of an accomplice's testimony, if he or she could have been indicted and convicted for the offenses charged, whether as principal or accessory. Wilcox v. State, 401 So.2d 789 (Ala.Cr.App. 1980), affirmed, 401 So.2d 794 (Ala. 1981). However, a witness's indictment for the same crime as the defendant does not per se raise a presumption that he was an accomplice. Washington v.State, 401 So.2d 236 (Ala. Cr. App), cert. denied, 401 So.2d 241
(Ala. 1981) (where the witness denied participation in the crime charged against the defendant and "never admitted any involvement in the crime").
In the present case, Dickie King never denied his role in the participation of this crime as the person who provided the murderer. He clearly could have been indicted for this offense, see Heath v. State, 455 So.2d 898, 901 (Ala.Cr.App. 1983), affirmed, 455 So.2d 905 (Ala. 1984), cert. granted in part,470 U.S. 1026, 105 S.Ct. 1390, 84 L.Ed.2d 780, affirmed,474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (wherein the appellant's brother who allegedly furnished the name of someone who would commit the murder was tried and acquitted), and, in fact, the F.B.I. initially pursued Dickie King for his role in the murder. He was picked up for questioning because of his involvement in the murder, and Diane Frazier was wired by the authorities and instructed to attempt to make Dickie King talk about his involvement in the murders.
However, it is this court's finding that the trial court's failure to charge the jury that Dickie King was an accomplice was harmless, in light of the corroborating evidence provided through the testimony of Diane Frazier, Richard Johnson, and Dalton Sheffield. The test for determining whether there is sufficient evidence to corroborate an accomplice's testimony is not whether the other evidence, standing alone, would support the conviction, but whether, after eliminating the testimony of the accomplice, the remaining evidence is sufficient to connect the accused with the crime. Davidson v. State, 491 So.2d 1040
(Ala.Cr.App. 1986).
Because the other evidence presented by the State sufficiently corroborated the testimony of Dickie King, the trial court's failure to instruct the jury that Dickie King was an accomplice as a matter of law and that they must find that his testimony was sufficiently corroborated was harmless error and does not fall within the purview of Rule 45A, Alabama Rules of Appellate Procedure. See Murry v. State, 562 So.2d 1348
(Ala.Cr.App. 1988), for a discussion on Alabama's "plain error" standard.
 VIII
In reviewing the appellant's death sentence, which arose under Alabama's 1975 capital murder statute, we make the following findings pursuant to the three-tiered analysis ofBeck v. State, 396 So.2d 645 (Ala. 1980): the appellant was convicted of murder wherein two or more persons are murdered by one or a series of acts, § 13-11-2(a)(10), Code of Alabama
(1975) (repealed); murder committed during the course of a robbery in the first degree, § 13-11-2(a)(2), Code of Alabama
(1975) (repealed); and murder done for pecuniary or other valuable consideration or pursuant to a contract for hire, § 13-11-2(a)(7), Code of Alabama (1975) (repealed). By statutory definition and designation, these are capital offenses. This court takes judicial notice that similar crimes are being punished capitally throughout this state. Berard v. State,486 So.2d 458 (Ala.Cr.App. 1984), reversed, 486 So.2d 476 (Ala. 1985) (murder of two or more people); Bryars v. State, 456 So.2d 1122
(Ala.Cr.App. 1983), reversed, 456 So.2d 1136 (Ala. 1984) (murder of two or more people); Baldwin v. State, 456 So.2d 117
(Ala.Cr.App. 1983), affirmed, 456 So.2d 129 (Ala. 1984), affirmed, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985) *Page 559 
(robbery-intentional murder); Bell v. State, 475 So.2d 601
(Ala.Cr.App. 1984), affirmed, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985) (robbery murder); Bush v. State, 431 So.2d 555
(Ala.Cr.App. 1982), affirmed, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983) (robbery murder); Davis v. State, 554 So.2d 1094
(Ala.Cr.App. 1984), extended on rehearing, (December 9, 1986) (robbery murder); Hill v. State, 455 So.2d 930 (Ala. Cr. App), affirmed, 455 So.2d 938 (Ala.), cert. denied, 469 U.S. 1098,105 S.Ct. 607, 83 L.Ed.2d 716 (1984) (murder of two or more people); Williams v. State, 461 So.2d 834 (Ala.Cr.App. 1983), reversed, 461 So.2d 852 (Ala. 1984) (murder for pecuniary consideration or for hire).
This court further finds that the sentence was not disproportionate in relation to the penalty imposed in similar cases, specifically the case against Lee Jackson, which was nol-prossed, and the case against Grady Lambert, which ended in an acquittal, because of the nature of the evidence, the crime, and the defendant. The State had evidence of direct admissions made by the appellant to other witnesses, whereas Lee Jackson made no such admissions. Further, the fact that the appellant's wife testified against him, gives credence to her testimony concerning the appellant's admission.
 " 'The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences.' Williams v. Illinois, 399 U.S. 235, 243, 90 S.Ct. 2018, 2023, 26 L.Ed.2d 586, 594 (1970); United States v. Satterfield, 743 F.2d 827, 841 (11th Cir. 1984), cert. denied, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). 'The Supreme Court has stated that discretionary decisions of State prosecutors to grant immunity to some participants of a crime and not others is not arbitrary or cruel and unusual under the constitution. See Gregg v. Georgia, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (Justices Stewart, Powell and Stevens); Proffitt v. Florida, 428 U.S. [242] at 254, 96 S.Ct. [2960] at 2967 [49 L.Ed.2d 913
(1976)].' Palmes v. Wainwright, 725 F.2d 1511, 1524
(11th Cir.), cert. denied, 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). Such a contention of disproportionality based on a grant of immunity does not present a 'cognizable basis for relief.' Id.
". . . .
 "This Court considered the principles involved in this issue . . .:
 " 'While Beck, 396 So.2d at 664, obligates this Court to consider the punishment received by alleged accomplices, it does not require or direct that every defendant implicated in a crime receive the same punishment. "There is not a simplistic rule that a co-defendant may not be sentenced to death when another co-defendant receives a lesser sentence. Collins v. State, 243 Ga. 291, 253 S.E.2d 729 (1979). Each case is evaluated on its unique factual circumstance." McClesky v. State, 245 Ga. 108, 263 S.E.2d 146, 151, cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). [Citations omitted.] . . . [T]he Supreme Court of South Carolina has held that while a number of "defendants are equally guilty of the crime of murder . . ., they are not ipso facto deserving of the same punishment." State v. Shaw, 273 S.C. 194, 255 S.E.2d 799, 804, cert. denied, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1979).
". . . .'
 "Because of 'the need for individualized consideration as a constitutional requirement in imposing the death sentence,' Lockett v. Ohio, 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (1978), the focus must be on the defendant. Enmund v. Florida, 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140, 1152 (1982); Williams [v. State, 461 So.2d 834, 849-50 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852 (Ala. 1984)]."
Wright v. State, 494 So.2d 726, 739-40 (Ala.Cr.App. 1985) affirmed, 494 So.2d 745 *Page 560 
(Ala. 1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1331,94 L.Ed.2d 183 (1987). See also Thomas v. State, 460 So.2d 207
(Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984).
We further do not find that the appellant's death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor.
The evidence fully supported the trial court's finding of the statutory aggravating circumstances listed in its written order: the capital felony was committed while the defendant was under sentence of imprisonment, specifically being on parole for the felony of forgery, as codified in § 13-11-6(1), Code ofAlabama (1975) (repealed); although the defendant had not been previously convicted of another capital felony, he was convicted in 1982 of reckless endangerment where the initial charge was robbery in the first degree; the capital felony was committed while the defendant was engaged in, or was an accomplice in, the commission of robbery; the capital felony was committed for pecuniary gain; the capital felony was heinous, atrocious, and cruel in that it was a planned, premeditated, execution-style "hit" for money wherein the victim's wife was also killed "for simply being in the wrong place at the fatally wrong time," Ex parte Tomlin, 443 So.2d 59
(Ala. 1983), cert. denied, 466 U.S. 954, 104 S.Ct. 2160,80 L.Ed.2d 545 (1984). The trial court found the existence of no mitigating circumstances. In the instant case, the aggravating circumstances " 'remarkably and exceedingly outweigh the mitigating circumstances.' " Thomas v. State, 460 So.2d 207,214 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984), quoting Dunkins v. State, 437 So.2d 1349 (Ala.Cr.App. 1983), affirmed, 437 So.2d 1356 (Ala. 1983). Therefore, the finding of the trial court that death is the appropriate sentence is due to be affirmed.
The judgment of conviction and the sentence are affirmed.
STATE'S APPLICATION GRANTED; ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; APPELLANT'S APPLICATION OVERRULED; AFFIRMED.
TAYLOR, P.J., and TYSON, J., concur.
BOWEN and PATTERSON, JJ., concur in result only.
[1] This repealed statute and the pertinent subsections were replaced by § 13A-5-40(a)(10), (2), and (7), Code of Alabama
(1975), respectively.
[2] At a subsequent trial of another conspirator, defense counsel presented evidence that, during January 1977 in Mobile, the temperatures fluctuated from the mid-twenties to the mid-thirties, indicating that it was highly unlikely that the appellant was cutting his brother's grass.
[3] Apparently, Dalton Sheffield was led to believe that the implementation of the Habitual Felony Offender Act was discretionary.
[4] One of the victims' sons testified that Mr. Doughty had an extensive gun collection in the house. The son also verified the fact that one of the guns had a gold trigger.
[5] One of the victims' sons testified that when he found his parents, there was a bag of groceries and some oysters were opened on the bar, as if his parents had intended to prepare them for dinner.
[6] One of the victims' sons testified that Mr. Doughty kept a tin box with large sums of money in it hidden in his couch. He testified that he had recently seen approximately $28,000 in the box.
[7] Compare United States v. Shaffer, 789 F.2d 682 (9th Cir. 1986) (wherein the court concluded that, where the defendant had requested the disclosure of exculpatory material, he was entitled to a new trial; evidence that a key government witness had been involved in an undercover capacity in the investigation of a separate heroin operation and had been given payments and made certain promises in return for his involvement was material, and the government's disclosure of payment of expenses of witness was inadequate).
[8] However, after reviewing these articles, which are contained in the record, we note that not all of the details to which the witnesses were privy were contained in the articles.